UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| James B. Ratliff, | : | Case No. 1:08CV2388 |
| Plaintiff | : | Judge Sara Lioi |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §405(g) seeking judicial review of defendant's final determination denying plaintiff's claim for disability benefits, 42 U.S.C. §§416(i), 423, is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in her favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

Plaintiff applied for benefits on March 16, 2004, alleging an onset date of September 1, 2003. In an accompanying Disability Report - Adult the questions "What are the illnesses, injuries or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?" were answered "Bi polar [sic]/memory loss" and "my emotional level fluctuates from extremes. i [sic] have difficulty getting out of bed.  i [sic] sleep a part of the day, when i [sic] was working i [sic] cried all day long."

Upon denial of plaintiff's claim on the state agency level hearing de novo before an

Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on December 14, 2006.[1] Also testifying at that proceeding was a vocational expert, Mr. Gene Burkhammer.

To say that the plaintiff's testimony as to the basis of her alleged disability was perfunctory, both when examined by the ALJ and her counsel, is hardly an understatement.

When first examined by the ALJ on that subject she testified:

> Q. Okay. And what happened on March 1, 2003 then that you couldn't work?
>
> A. I had my last breakdown—like I had not a breakdown, but the more I start crying and stuff on the work and my husband just told me just to go home and stay home.[2]
>
> Q. How are you doing today compared with March 1 of '03?
>
> A. As of today? I'm doing a little bit better, but I still—nerves and stuff or if I get anxious or excited either I cry, the inside of my body shakes, so it really depends on what part of the day you get me; I could be good and I could be not so good.
>
> Q. Early on you had hospitalization, did you not?
>
> A. Yes. I did.
>
> Q. Okay. How many have you had?
>
> A. Just the one.
>
> Q. And either the doctor had difficulty finding the right medication for you or you were noncompliant where there's notes for that. Can you tell me about that?
>
> A. Well just because—noncompliant because of the side effects—

---

[1] Plaintiff's brief erroneously identifies the hearing date as December 1, 2008.

[2] The plaintiff's employment had been with her husband's roofing business.

2

> Q. Okay. And what—
>
> A. —that I got. Most of the time when he gave me a, a new drug I would have very bad side effects to it.
>
> Q. And how many times did, did he have to change your medication, do you know?
>
> A. He has changed, o my gosh, he's changed my mediation so many times I couldn't even tell you.
>
> Q. And are you taking your medication now as prescribed?
>
> A. Yes. Yes. I am.
>
> Q. And when's the last time you've had a medication with side effects?
>
> A. When he put me on this newest one.
>
> Q. How long has that been?
>
> A. —but I waited through to see if they would—the side effects would go away.
>
> Q. Okay. Do you have anything wrong with you that limits your physical abilities?
>
> A. No.

Her counsel's examination was even less illuminating:

> Q. Okay. Was there ever a period of time between 2003 and the present that you think you could have worked on a regular basis?
>
> A. For me to get out of bed is a plus in the morning. I have a hard time doing daily tasks; one of them is taking my pills and I have a pill reminder, two of them, and just trying to get through a day is, is been very hard.
>
> Q. Okay. Did you take any medications this morning?
>
> A. Yes. I did.

3

Q. Which medications did you take this morning?

A. I'd have to look up—I don't, I don't know them by heart.

Q. Okay. you took everything you're supposed to take this morning you took this morning?

A. Um-hum. In fact yesterday I took when I wasn't supposed to. I was thinking I was supposed to have taken it—because I ran out and I should have taken it that night and when I got it yesterday afternoon I thought that I was supposed to—well anyway I took the pill and it knocked me out. So I was—when my husband came home I was sound asleep.

Q. Do you recall when it was that it was the first time you went to the Nord (Phonetic) Center?

A. Whatever that September date was or whatever that's when I went to the Nord Center.

Q. September of—

A. Yeah.

Q. —2003?

A. yeah.

Q. And were you working at that time?

A. No.

Q. Had you been working in the months previous to that?

A. No.

Q. What had you been doing?

A. Sleeping.

Q. Anything else?

A. Not much of anything, no. Sleeping and crying pretty much covers its.

4

    Q.  So you're very emotional in that year? Anything—

    A.  I, I still am—

    Q.  —particular that—

    A.  —that hasn't—the emotional hasn't gone away.

This was followed by the ALJ asking the plaintiff:

    Q.  Ma'am, I don't ask questions to embarrass you or to be funny, but I—or anything close to it, but can you tell me what, what do you think precipitated all, all this back in '03 or whenever it was?

    A.  I really couldn't tell you. I, I wish I knew. I wish I could turn back the time and be back before then. I just like I said I just ry to make it through everyday as best as I can. My mother comes over and helps me do dishes and laundry, she takes me everywhere, I can't go anywhere by myself, she takes me grocery shopping. I don't know what started this, but the only thing I remember is the last job we worked on. I remembered my husband was up on a roof on a ladder and he was calling for me, and I was just balling [sic] my eyes out and I couldn't go help him, and that's when he said it was time—he sent me home and he said don't come back.

On February 22, 2007 the ALJ entered his opinion denying plaintiff's claim. That decision became defendant's final determination upon denial of review by the Appeals Council on August 12, 2008. The ALJ's "Findings of Fact and Conclusions of Law" were:

    1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

    2.  The claimant has not engaged in substantial gainful activity since September 1, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

    3.  The claimant has severe impairments of attention deficit hyperactivity disorder and bipolar disorder (20 CFR 404/1520(c)). All other alleged impairments are considered not severe because they do not impose more than a minimal limitation of her daily activities, medications provide adequate

      control of the problems, or there are no medical records in the file to substantiate the problem.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1529(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform work activity at all exertional levels. She can perform routine, one, and two step procedures. She can no perform work that involves confrontation, arbitration, negotiation. or supervision.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 29, 1961 and was 41 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from September 1, 2003 through the date of this decision (20 CFR 404.1520(g)).

On this appeal two issues are presented, those being:

    Whether vocational-expert testimony supports the decision's Step 5 finding where the vocational expert indicated that a limitation to one-

>and two-step instructions was inconsistent with work requiring an SVP of 2, the jobs identified by the vocational expert all had an SVP of 2, and the decision ultimately found that the claimant is limited to only one-and two-step instructions?
>
>Whether the decision's finding concerning residual functional capacity is in error where Ms. Ratliff's treating psychiatrist found much greater limitation on her ability to work, his opinion is supported by the record as a whole, and the decision erred in rejecting this opinion in favor of the insubstantial opinion of the non-examining state-agency doctor?

This Court does not find it necessary to address the first claim of error, as this Court finds the second claim to be of merit and dispositive.

The plaintiff has been under the care of Dr. Samer Alamir, a psychiatrist at the Nord Center, since March of 2003. The record contains reports from Dr. Alamir, along with his patient notes, and evidence originating with other mental health professionals at the Nord Center, all of which supports the plaintiff's position

The first report from Dr. Alamir is his response to an inquiry from the state agency authorities dated May 20, 2004. Therein he sets out the plaintiff's diagnosis as bipolar disorder II, which, in pertinent part, is defined at the National Institute of Mental Health website in the following terms:

>Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time.
>
> * * *
>
>People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called "mood episodes." An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode.

> Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state. People with bipolar disorder also may be explosive and irritable during a mood episode.
>
> Extreme changes in energy, activity, sleep, and behavior go along with these changes in mood. It is possible for someone with bipolar disorder to experience a long-lasting period of unstable moods rather than discrete episodes of depression or mania.
>
> A person may be having an episode of bipolar disorder if he or she has a number of manic or depressive symptoms for most of the day, nearly every day, for at least one or two weeks. Sometimes symptoms are so severe that the person cannot function normally at work, school, or home.
>
> \* \* \*
>
> **Bipolar II Disorder** is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes.

Therein Dr. Alamir stated that several medications had been tried, but that the plaintiff had difficulty coping with them. He further stated that the plaintiff had "Difficulty completing tasks, poor concentration" and, most importantly, in response to the question "How would the patient react to the pressures, in work settings or elsewhere, involved in simple, routine, or repetitive tasks?" he stated "At this time, it would be difficult for client to respond appropriately to assigned tasks and to daily pressures."

Under the date December 22, 2004 Dr. Alamir completed a Medical Source Statement Concerning The Nature And Severity Of An Individual's Mental Impairment, which called upon him to rate the plaintiff's ability to function in a number of areas. The rating of "markedly limited" is defined therein as "An impairment which precludes the individual's ability to function independently, appropriately, and effectively in the designated areas on a sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule." Dr. Alamir rated the plaintiff as so

8

limited in the ability to work in coordination with or proximity to others without being unduly distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rests periods; and the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.

Under the heading of "Substantial Loss," which connotes "severe limitation or substantial erosion of the ability to perform even unskilled work" and "would warrant or justify a finding of disability" Dr. Alamir checked off that the plaintiff suffered from a substantial loss in each of the four categories set out in the form, being the ability "to understand, remember and carry out simple instructions"; "to make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions"; "to respond appropriately to supervisors, co-workers and usual work situations"; and "to deal with changes in a work setting."

Under "Comments" he added "Client continues to experience difficulties completing basic tasks."

About two years later (December 8, 2006) Dr. Alamir completed another such form. At that time he found the plaintiff to be even more limited than he had before, this time rating her as markedly limited in the following areas (along with others): the ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure); the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in close proximity to others without being unduly distracted by them; the ability to make simple work-related

decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rests periods; the ability to accept instructions and to respond appropriately to criticism from supervisors; and, the ability to set realistic goals or to make plans independently of others.

As he did in 2004, the doctor checked off that the plaintiff suffered from a substantial loss in each of the four enumerated categories. His Comments were more expansive than before, this time reading:

> Patient has been followed up by me since September of 2003. She has a diagnosis of bipolar disorder and she has been treatment resistant. She continued to have significant symptoms and mood swings despite her medications and this has impaired her judgment often. She has mismanaged money in the past due to poor judgment while manic and overspent on things she doesn't need. Her illness affected the whole family. She's easily overwhelmed and she has a poor frustration tolerance. She is forgetful and can't concentrate well.

In this Court's opinion one need not be a professional vocational expert to appreciate that an individual as limited as Dr. Alamir found the plaintiff to be in 2004 and 2006 is incapable of holding a job. The exercise of simple common sense dictates that conclusion.

After setting out the evidence originating with Dr. Alamir the ALJ made the conclusory statement "Dr. Alamir's opinion is not given weight because it is not supported by the evidence," without any explanation as to why the doctor's determinations were not supported by the evidence. Insofar as this Court is able to ascertain from the body of the ALJ's opinion his rejection of Dr. Alamir's conclusions may well be based upon a very selective excerpting of the evidence (otherwise known as fly specking), seizing upon activities she reported engaging in while in the manic phase

of her bipolar disorder, disregarding the fact that her doing so while in an "up" period is not at all inconsistent with the existence of a mental impairment of disabling severity.

The bottom line, in this Court's opinion, is that the ALJ manifested a woeful lack of understanding of the mental impairment of bipolar disorder and substituted his judgment as to the consequences of the plaintiff's bipolar disorder for that of her treating psychiatrist, which is plainly violative of the "treating physician rule." As was reiterated in Howard v. Commissioner of Social Security, 276 F.3d 235, 240 6 (6th Cir. 2002), citing to Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985), while it is often said that the opinion of a treating physician on the ultimate issue of disability is not binding, see, Le Master v. Weinberger, 533 F.2d 337 (6th Cir. 1976) that is not always the case. In King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) the court stated the controlling rule to be "Indeed, it has long been the law that substantial deference--and, if the opinion is uncontradicted, complete deference--must be given to such opinions and diagnoses." See also, Colwell v. Gardner, 386 F.2d 56, 72 (6th Cir. 1967); and Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967).

To be entitled to significant weight the conclusory opinion of a treating physician must be supported by clinical or diagnostic findings. Kirk v. Secretary of Health and Human Services, 667F.2d 524, 538 (6th Cir. 1981). However, it is not necessary that such supporting detail be contained in the same document in which the physician's opinion is expressed. It is sufficient if that opinion is supportable by other medical evidence in the record, including clinical or diagnostic findings of other physicians. See, Garner v. Heckler, 745 F.2d 383, 391 (6th Cir. 1984).

The rationale behind the treating physician rule was set out by the Sixth Circuit in Walker v. Secretary of Health and Human Services, 986 F.2d 1066 (6th Cir. 1992), as follows:

11

> The medical opinion of the treating physician is to be given substantial deference and, if that opinion is not contradicted, complete deference must be given. The reason for such a rule is clear. The treating physician has had a greater opportunity to examine and observe the patient. Further, as a result of his duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians.

Id., at 1070. While it is true that the ultimate decision of disability is with the ALJ, ibid, if the ALJ discredits the opinion of a treating physician he/she must articulate a cogent reason for doing so, Wilson v. Commissioner of Social Security, 378 F.3d 541, 545 (6th Cir. 2004).

In this case the ALJ failed to provide a cogent reason for rejecting Dr. Alamir's conclusions.

It is recommended that the defendant's final determination be reversed, and final judgment entered in the plaintiff's favor finding that she is entitled to an award of DIB pursuant to her application of March 16, 2004.

s/DAVID S. PERELMAN
United States Magistrate Judge

DATE:   November 18, 2009

**OBJECTIONS**

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).